Salvatore **COTTONE**, Appellant,

v.

Janet **RENO**, Attorney General of the United States Department of Justice, Appellee.

No. 98–5497.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 1, 1999.

Decided Oct. 26, 1999.

Edwin E. Huddleson, III, pro bono counsel, argued the cause and filed the briefs for appellant.

David T. Smorodin, Assistant United States Attorney, argued the cause for appellee. With him on the brief were Wilma A. Lewis, United States Attorney, and R. Craig Lawrence, Assistant United States Attorney.

Before: EDWARDS, Chief Judge, WALD and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

The principal question in this case is whether wiretapped recordings, otherwise exempt from disclosure under the Freedom of Information Act ("FOIA"), must nevertheless be released when a requester precisely identifies specific tapes that have been introduced into evidence and played in open court during a public criminal trial. We hold that unless the government can rebut such a specific showing by demonstrating that the recordings have since been destroyed or otherwise removed from the public record, they must be released under FOIA. We accordingly reverse the judgment of the district court to the contrary. Moreover, because the district court neglected to address whether the government properly withheld other requested tape recordings, we must remand for further proceedings.

## I. BACKGROUND

Arising from a criminal investigation of the Colombian and Sicilian Mafia's involvement in the Northern Virginia–Washington, D.C. drug trade, the government successfully prosecuted appellant Salvatore Cottone on fourteen counts of drug and racketeering-related offenses. *See United States v. Cottone*, 928 F.2d 400, 1991 WL 34996 (4th Cir.1991) (per curiam) (table). Among the evidence that the government marshaled during Cottone's trial were telephone conversations recorded by surreptitious wiretap and recorded conversations procured by undercover agents wearing hidden recorders during face-to-face meetings with Cottone. In open court, before the jury and the public gallery, the government played these tapes and introduced them into evidence. As is the practice when tapes are played at trial, however, the court reporter did not transcribe the contents of the recorded conversations into the trial transcript. Rather, with each tape that the government played, the reporter indicated in the transcript the precise date and time that the conversation had been recorded, the unique identification number assigned to that tape at trial, and noted that it had been "played for the Court and jury." *See, e.g.*, App. 104–06 (Tape T–101 recorded on Sept. 12, 1986 at 10:32 a.m.); App. 117 (Tape T–102 recorded on Sept. 12, 1986 at 5:02 p.m.); App.

126–27 (Tape T–105 recorded on Sept. 30, 1986 at 5:45 p.m.); App. 129–31 (Tape T–107 recorded on Sept. 30, 1986 at 8:34 p.m.); App. 144–45 (Tape T–108 recorded on January 12, 1987 at 12:36 p.m.). At no point during the trial or thereafter did the government move to place these tapes under seal.

By letter dated January 27, 1992, Cottone tendered a FOIA request to the Federal Bureau of Investigation ("FBI") for copies of all documents and tape recordings cross-referenced to his name, including those tapes that the government had played for the jury during his trial. Although the FBI eventually produced over 1300 pages of responsive documents, it disclosed in part only two tape recordings, each one heavily redacted pursuant to Exemption 7(C), which insulates from mandatory disclosure records or information compiled for law enforcement purposes that, if produced, "could reasonably be expected to constitute an unwarranted invasion of privacy." 5 U.S.C. § 552(b)(7)(C). Invoking Exemption 3, which protects information "specifically exempted from disclosure" by another statute, 5 U.S.C. § 552(b)(3), the FBI withheld in full all other responsive tape recordings. Unlike the two redacted tapes that the FBI produced, these remaining conversations had been obtained by wiretap pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. No. 90–351, 82 Stat. 197 (codified as amended at 18 U.S.C. §§ 2510–2521 (1994 & Supp. IV 1998)) ("Title III"), which, we have explained on several occasions, "falls squarely within the scope of Exemption 3 because its language clearly evinces Congress' intent that intercepted material, except in a few well-defined circumstances, remain secret." *Davis v. United States Dep't of Justice*, 968 F.2d 1276, 1280–81 (D.C.Cir. 1992) (quotation omitted); *accord Lam Lek Chong v. United States Drug Enforcement Admin.*, 929 F.2d 729, 733–34 (D.C.Cir.1991).

Unsatisfied with the FBI's response to his FOIA request, Cottone brought suit in the district court. With respect to the two tapes that the FBI had redacted pursuant to Exemption 7(C), he argued that neither tape jeopardized any legitimate privacy interest because those persons identified on the tapes had either consented to disclosure or had died. As for the remaining tapes putatively protected from disclosure under Exemption 3, Cottone essentially maintained that the government had waived its Exemption 3 claim once it placed those tapes into the public domain by playing them to the jury and admitting them into evidence during his criminal trial. In its initial opinion adjudicating the parties' cross–motions for summary judgment and then again in its opinion disposing of Cottone's motion for reconsideration, the district court rejected Cottone's waiver argument. Although acknowledging that otherwise exempt materials lose their privileged status under FOIA once they find their way into the public domain, the district court found that Cottone had not met his burden of "showing that there is a permanent record of the exact portion" of the tapes that he requested. *Cottone v. FBI*, Civ. No. 94–1598 (JR), slip op. at 3 (D.D.C. Oct. 7, 1998). Having determined that the FBI properly invoked Exemption 3 to withhold the wiretapped recordings, the district court granted the agency's motion for summary judgment and dismissed the case. In neither of its opinions, however, did the court address whether the FBI properly invoked Exemption 7(C) to redact most of the two disclosed tapes. To this date, the FBI has yet to submit an agency affidavit and *Vaughn* index justifying its Exemption 7(C) redactions.

## II. DISCUSSION

### A. The Exemption 3 Withholdings

█ Two propositions, each firmly anchored in our prior FOIA decisions, must be set forth at the outset. The first is that, subject to an important, albeit nar-

row exception, the wiretapped recordings obtained pursuant to Title III that Cottone requested are ordinarily exempt from disclosure under Exemption 3, 5 U.S.C. § 552(b)(3). *See Davis*, 968 F.2d at 1280–81; *Lam Lek Chong*, 929 F.2d at 733–34. The second proposition, however, is the exception that qualifies this otherwise absolute rule. Under our public-domain doctrine, materials normally immunized from disclosure under FOIA lose their protective cloak once disclosed and preserved in a permanent public record. *See Niagara Mohawk Power Corp. v. United States Dep't of Energy*, 169 F.3d 16, 19 (D.C.Cir. 1999) (Exemption 4); *Public Citizen v. Department of State*, 11 F.3d 198, 201–03 (D.C.Cir.1993) (Exemption 1); *Davis*, 968 F.2d at 1279–80 (Exemptions 3 & 7(C)); *Afshar v. Department of State*, 702 F.2d 1125, 1130–34 (D.C.Cir.1983) (Exemptions 1 & 3). For as we have recently observed, "the logic of FOIA" mandates that where information requested "is truly public, then enforcement of an exemption cannot fulfill its purposes." *Niagara Mohawk*, 169 F.3d at 19; *see also Davis*, 968 F.2d at 1279 ("We have held, however, that the government cannot rely on an otherwise valid exemption claim to justify withholding information that has been 'officially acknowledged' or is in the 'public domain.' ").

■ With these established principles of law in mind, we turn now to examine whether the ordinarily exempt Title III-wiretapped recordings that Cottone requested entered the public domain and thereby shed their Exemption 3 protection. On this issue, the party advocating disclosure bears the initial burden of production; for were it otherwise, the government would face the daunting task of proving a negative: that requested information had not been previously disclosed. *See Niagara Mohawk*, 169 F.3d at 19; *Davis*, 968 F.2d at 1279. To satisfy his burden, Cottone must "point[ ] to specific information in the public domain that appears to duplicate that being withheld." *Afshar*, 702 F.2d at 1130.

■ This Cottone has done. As a threshold matter, our decisions construing the venerable common-law right to inspect and copy judicial records make it clear that audio tapes enter the public domain once played and received into evidence. *See, e.g., In re National Broadcasting Co.*, 653 F.2d 609, 614 (D.C.Cir.1981); *United States v. Mitchell*, 551 F.2d 1252, 1258 & n. 21 (D.C.Cir.1976), *rev'd on other grounds sub nom. Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978). We have long observed "the general rule ... that a trial is a public event, and what transpires in the court room is public property." *In re National Broadcasting Co.*, 653 F.2d at 614 (internal quotations and brackets omitted); *accord Craig v. Harney*, 331 U.S. 367, 374, 67 S.Ct. 1249, 91 L.Ed. 1546 (1947). Under this rule, we have recognized that even after a trial has concluded, members of the press may obtain copies of surreptitiously recorded audio tapes that have been played in court and received into evidence. *See In re National Broadcasting Co.*, 653 F.2d at 614–16. Therefore, until destroyed or placed under seal, tapes played in open court and admitted into evidence—no less than the court reporter's transcript, the parties' briefs, and the judge's orders and opinions—remain a part of the public domain.

While our cases leave little doubt that audio tapes aired publicly in open court become a part of the public domain, the question remains whether Cottone has satisfied his "burden of showing that there is a permanent public record of the *exact* portions he wishes." *Davis*, 968 F.2d at 1280 (emphasis added). The government maintains, and the district court agreed, that our decision in *Davis* is dispositive. True, the plaintiff in *Davis*, like Cottone, claimed that the public domain doctrine vitiated Exemption 3 protection for Title III-wiretapped recordings that had been previously played in open court during a

criminal trial. But there the similarities end. We rejected the plaintiff's waiver argument in *Davis* because he could not identify which *specific* tapes had been played during trial. Although the prosecutors had compiled a "play list" of 163 excerpted tape recordings, not all were used, "and apparently no one, including the court reporter, kept any official record of the conversations played for the jury." *Id.* at 1278. Under these circumstances, we concluded that it simply was not enough "to show—as [Davis] ha[d] done—that *some* of the tapes were played to shift the burden to the government." *Id.* at 1280. Indeed, to have compelled disclosure in the face of such uncertainty would have ignored the "injury that disclosure might cause innocent third parties," who we believed, "should not suffer because neither the government nor [the requester] can establish whether references to them on the tapes are available elsewhere." *Id.*

Unlike the situation we confronted in *Davis*, however, Cottone has demonstrated precisely which recorded conversations were played in open court. Looking at the official transcript of Cottone's trial, there are at least five audio tapes that the court reporter specifically noted had been "played for the Court and jury" and subsequently admitted into evidence. And for each of these, the trial transcript clearly indicates the precise date and time that the particular conversation was recorded and the unique identification number assigned to the tape. *See, e.g.,* App. 104–06 (Tape T–101 recorded on Sept. 12, 1986 at 10:32 a.m.); App. 117 (Tape T–102 recorded on Sept. 12, 1986 at 5:02 p.m.); App. 126–27 (Tape T–105 recorded on Sept. 30, 1986 at 5:45 p.m.); App. 129–31 (Tape T–107 recorded on Sept. 30, 1986 at 8:34 p.m.); App. 144–45 (Tape T–108 recorded on Jan. 12, 1987 at 12:36 p.m.). With such a specific showing, we are not left to guess which tapes have entered the public domain and which have not. In turn, we may carefully tailor the FBI's disclosure duty to ensure that we do not jeopardize

the legitimate privacy interests of innocent third parties whose names may be mentioned on other Title III tapes never played during trial. Cottone, therefore, has discharged his burden of production by pointing to specific tapes which, having been played in open court and received into evidence, reside in the public domain and mirror precisely the information that he has requested.

To be sure, we suggested in *Davis* that, to satisfy the burden of production in public-domain cases, the FOIA requester may have to produce a "hard copy" version of what he requests. *See Davis*, 968 F.2d at 1280. Yet by no means did *Davis* purport to establish a uniform, inflexible rule requiring every public-domain claim to be substantiated with a hard copy simulacrum of the sought-after material. Of course, it will very often be the case that some type of hard copy facsimile will be the only practicable way for a FOIA requester to demonstrate that the specific information he has solicited has indeed circulated into the public domain. And this is as it should be; for while the "logic of FOIA" postulates that an exemption can serve no purpose once information—including sensitive law-enforcement intelligence—becomes public, *Niagara Mohawk*, 169 F.3d at 19, we must be confident that the information sought is truly public and that the requester receive no more than what is publicly available before we find a waiver. *See Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C.Cir.1990); *Afshar*, 702 F.2d at 1130–32; *Military Audit Project v. Casey*, 656 F.2d 724, 752 (D.C.Cir.1981). But here it would be an empty formalism to insist that Cottone produce a hard-copy, verbatim transcription of the audio tapes to prove which tapes were played at trial when he has already produced a certified transcript from his trial that indicates precisely which tapes were, in fact, played. Phrased in the parlance of our public-domain cases, Cottone has "point[ed] to specific information in the public domain that appears to

duplicate that being withheld." *Afshar,* 702 F.2d at 1130.

■ Once the FOIA requester has carried his burden of production, it is up to the government, if it so chooses, to rebut the plaintiff's proof by demonstrating that the specific tapes or records identified have since been destroyed, placed under seal, or otherwise removed from the public domain. The FBI, however, has made no such showing here. Nothing in the record suggests that the government, either during or after Cottone's trial, moved to place under seal the tapes that it played in court. Nor is there any indication that the tapes Cottone has identified have since been destroyed. Indeed, the FBI operates under a statutory mandate to preserve all Title III-wiretapped recordings for ten years. *See* 18 U.S.C. § 2518(8)(a). Therefore, because Cottone has identified specific audio tapes in the public domain that duplicate what he has requested, and because the FBI has not rebutted this showing, we conclude that Exemption 3 is inapplicable and reverse the judgment of the district court accordingly.

■ Our decision, however, extends only to those tapes that were played in open court. To the extent that Cottone seeks Title III-wiretapped recordings that were not played in court but were simply provided to his counsel as *Brady* material, Exemption 3 remains inviolate. This is so because a constitutionally compelled disclosure to a single party simply does not enter the public domain. Moreover, even were these tapes somehow understood to reside in the public domain, Cottone certainly has not satisfied his burden of production and shown which specific tapes the government tendered to his attorney during pretrial discovery. Therefore, insofar as Cottone seeks any Title III-wiretapped tapes that were not played in open court and received into evidence, the judgment of the district court is affirmed.

## B. *The Exemption 7(C) Withholdings*

■ In his cross-motion for summary judgment Cottone argued that the FBI had improperly invoked Exemption 7(C) to redact virtually all portions of the two audio tapes that the agency had released. For some reason, the district court never ventured beyond Cottone's Exemption 3 objections, dismissing the case without evaluating the propriety of the FBI's Exemption 7(C) claim. Notwithstanding the district court's oversight, on appeal the FBI maintains that the case was properly dismissed anyway since, by its own determination, it validly applied Exemption 7(C).

■ Even were we inclined to review the agency's Exemption 7(C) redactions without first remanding to the district court, the present record would preclude us from meaningfully exercising our power of judicial review. To justify its invocation of a particular exemption, the agency must append a declaration to its motion for summary judgment that "provide[s] detailed and specific information demonstrating 'that material withheld is logically within the domain of the exemption claimed.'" *Campbell v. United States Dep't of Justice,* 164 F.3d 20, 30 (D.C.Cir.1999) (quoting *King v. United States Dep't of Justice,* 830 F.2d 210, 217 (D.C.Cir.1987)); *see also Vaughn v. Rosen,* 484 F.2d 820, 827 (D.C.Cir.1973). This the FBI has completely failed to do. All that the agency can point to is an unsworn cover letter sent to Cottone from an official with the FBI that conclusorily asserts that "[t]he long pauses constitute exempt information, much of it pertaining to third parties." App. 181. We, therefore, must remand this matter to the district court, which should instruct the FBI to prepare a *Vaughn* index and declaration that "supply a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of [the] withheld [tape] to which they apply."

*King*, 830 F.2d at 224 (internal quotation omitted).

### III. CONCLUSION

For the foregoing reasons, we reverse the district court's judgment upholding the FBI's decision to withhold under Exemption 3 audio tapes that Cottone has precisely identified in the public domain, and remand with instructions to compel the FBI to release those tapes. In all other respects, we affirm the district court's judgment that Exemption 3 applies to Title III-wiretapped conversations. On remand, the district court should also order the FBI to prepare a *Vaughn* index justifying its redactions under Exemption 7(C).

*So ordered.*